*510 Cavanagh, J.
(dissenting). I concur in the majority’s holding that the police conduct did not entrap defendant into the second transaction. However, I would conclude that the police conduct did entrap defendant into the first transaction; therefore, I respectfully dissent.
The majority’s conclusion that defendant constructively possessed cocaine and, therefore, was not entrapped into committing the possession crimes is based on repeated references to the informant’s claim that defendant “arranged, oversaw, and protected” the drug sales at the home defendant owned. See ante at 494, 500 (“[defendant owned a home that he rented to tenants who operated it as a drug house” and protected and received money for drugs sold.) Upon review of the entrapment hearing testimony, I question how the majority relies on this as support for its conclusion. The informant did not testify at the entrapment hearing. Rather, the information that the informant allegedly relayed to the police came into evidence through the police officer the informant contacted about defendant. This officer testified as follows:
Q. Now did this [informant] tell you how he [defendant] was involved?
A. Yes he did.
Q. And would you tell us what it was?
A. He said he was running a dope house.
Q. When you say he, you mean [defendant]?
A. No. [The informant] was running a house that—[defendant] owned the house and [the informant] was selling crack out of the house with [defendant’s] full knowledge and consent and more or less participation; not in the actual sale, but in setting it up and providing protection and in running the operation.
*511 The majority’s focus on this portion of the police officer’s testimony to support its repeated assertion that there was sufficient evidence showing defendant was more involved than the Court of Appeals discussed is misplaced. The most crucial part of the officer’s testimony, which sheds light on the Court of Appeals reasoning, is omitted.
Q. Did you ever run across any independent corroboration of [the informant’s] word?
A. I’m sorry?
Q. Independent corroboration meaning was there any evidence other than [the informant’s] statements that [defendant] had been involved in the-this proported [sic] dope house?
A. At that point, no.
Q. At any point?
A. Yes.
Q. And what was that?
A. I checked records on the house that was pointed out and [defendant] did in fact own that house; to me that was corroboration.
Q. Well. . .
A. It was—I knew it personally to be a dope house. However, prior to that point I did not know that [defendant] owned it.
Q. Okay. I guess what I’m asking is [the informant’s] story was that [defendant] was—knew about it and was looking the other way and taking money, isn’t that it?
A. That’s correct.
The police officer initially stated that the informant told him defendant set up, ran, and supervised the drug house. However, when asked what information corroborated what the informant allegedly said, the officer pointed to only the fact that defendant owned the home and accepted money to look the other way. *512 The trial court made its credibility determination on this testimony that defendant had no other involvement beyond owning the drug house and bribery. Contrary to the picture the majority paints of defendant’s part in the drug sales occurring in the home he owned, the record supports the Court of Appeals conclusion that defendant did nothing more than own a crack house and accept money to keep silent. Thus, the majority’s mischaracterization of defendant’s involvement directly conflicts with this Court’s duty to give deference to credibility determinations in light of direct testimony supporting them.[1]
*513 Moreover, the majority uses its own credibility judgment to supersede that of the lower courts to conclude that defendant knew about his duty to handle the drugs before the first transaction. The majority states, “A recorded audiotape of defendant and [the undercover officer] discussing their arrangement before the first staged drug transaction demonstrates that [the undercover officer] informed defendant that he would have to handle drugs on occasion . . . .” Ante at 504-505. When faced with the same evidence, the lower court and the attorneys themselves disagreed with the police witness and came to the contrary conclusion:
A. [Undercover Officer]: I believe I told [defendant] that we would—we met with the individual in which I was to make the purchase from, he was to take the drugs, check them, ensure that the package was right, let me know that it was right, and then we would leave.
Q. [Defense Counsel]: Now, Lieutenant, I don’t see that in the transcript of the audio tapes that was made. Let me hand this to you and maybe you can show me.
Mr. Martin [Assistant Prosecutor]: Which transaction are we talking about?
*514 Mr. Szokolay [Defense Counsel]: The transcript of the recording, body recording made February 7, 1992 [the first transaction].
* * *
The Court: Are you looking for something?
Mr. Szokolay: Yes, your Honor. The witness told us that he had told [defendant] prior to the buy that he would be expected to hold the package, and I asked him to find us where he said that.
The Court: Mr. Martin, can you agree that maybe it’s not there?
Mr. Martin: Your Honor, I believe the recording on February 7th doesn’t indicate prior to the deal that he was informed of that, but on page five it indicates that he was informed of that after, that it would be his job to check the package. [Emphasis added.]
The Court: That would be from the next transaction.
The Court of Appeals did not clearly err in concluding that on the basis of this evidence, the defendant was not informed before the first transaction that he would have to hold the drugs. Rather, all parties agreed that there was no evidence on that audio tape suggesting defendant was informed he would have to handle the drugs prior to the first transaction.
I cannot join a decision that not only mischaracterizes the facts in favor of a result, but also strips the deference that is due credibility determinations made by lower courts in such a way as the majority does today. Accordingly, I would reverse in part the decision of the Court of Appeals holding defendant was entrapped into the second possession transaction and affirm in part the decision of the Court of Appeals holding defendant was entrapped into the first.
Kelly, J., concurred with Cavanagh, J.

 The majority faults me for limiting my review to the hearing testimony from the entrapment hearing instead of the entire record, which, according to the majority, “supplies ample evidence” that defendant knew that his role was to “handle” the drugs. Ante at 504, n 3. Contrary to the majority’s assertion, I did not limit my review, but extracted evidence from the entire record that I believe supports the conclusion that defendant was entrapped into possessing the drugs in the first transaction (the only transaction for which I would conclude defendant was entrapped). To satisfy the majority’s concern, however, the following is an excerpt from the body recordings of the undercover officer and defendant, which again proves that the majority’s heavy reliance upon ambiguous dialog between defendant and the undercover officer before the February 7 audio tape is suspect. See ante at 505. Even after the ambiguous discussion, which the majority quoted, defendant clearly stated that he thought his involvement was to protect.
[Undercover Officer]: Ah man, alright, alright look, the reason, the reason I got you there is so that you there not eight places away. If you eight places away, you ain’t doing me no good.
[Defendant]: Two cars away.
[Undercover Officer]: That ain’t doing me no good.
[Defendant]: I heard everything you said.
[Undercover Officer]: What?
[Defendant]: I could hear you talking.
[Undercover Officer]: No, no, I don’t want you to hear me talk. I want you, I, you got to be there, that’s why I said ride up in the car with me. That way I can, if something happens man, I’m still stuck with the Goddamn package. I want to pitch it ... . That’s, that’s what I want.
[Defendant]: Oh, you want me to handle it.
*513 [Undercover Officer]: I don’t want, no, no, no, no, I, but if you’re in the car, just roll down the window. I can pitch it in there. I ain’t got, I ain’t holding nothing. That’s what I’m talking about, see? But you standing way over there, now I got to hold it and hold it, and hold it, until you get there because I, I, I can’t check the package and check him too. Alright. That’s my boy, but business is business.
[Defendant]: I thought you wanted protection, that’s what I was under the impression that you wanted me for. [Emphasis added.]
This conversation took place after the first transaction, thus revealing that defendant did not know he was to “handle” the drugs, but only thought he was to protect the undercover officer before the first transaction.